UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MELISSA RADER, on behalf of herself and all others similarly situated, | ) ) ) | Case No.  1:23-cv-160 |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWEST FEDERAL CREDIT UNION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Melissa Rader, on behalf of herself and all others similarly situated, brings this

Class Action Complaint against Defendant Northwest Federal Credit Union ("Defendant"), and

alleges as follows:

### INTRODUCTION

1.    Plaintiff brings this action on behalf of herself and classes of similarly situated

individuals against Defendant Northwest Federal Credit Union ("Defendant") over the improper

assessment and collection of (1) overdraft fees ("OD Fees") on debit card transactions authorized

on sufficient funds and (2) multiple fees on an item.

2.    Besides being deceptive, this practice breaches promises made in Defendant's

adhesion contract, attached hereto as Exs. A and B (the "Contract"), violates of Regulation E of

the Electronic Fund Transfer Act, 12 C.F.R. § 1005.17, breaches Defendant's duty of good faith

and fair dealing, and unjustly enriches Defendant to the detriment of its customers.

3.     Plaintiff alleges that because Defendant provided inaccurate and untruthful overdraft information to Plaintiff and the Classes regarding the overdraft practice, under Regulation E of the Electronic Funds Transfer Act, 12 C.F.R. § 1005, Defendant was not authorized to assess OD Fees to consumers for debit card and non-recurring debit card charges. However, Defendant did charge its customers overdraft fees for ATM and debit card charges.

4.     Plaintiff and other customers of Defendant have been injured by Defendant's improper fee maximization practice.

5.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

6.     As described herein, Defendant's practices violate Virginia common law, as well as Defendant's own form contracts.

7.     Defendant's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of other similarly situated consumers. Unless enjoined, Defendant will continue to engage in these schemes and will continue to cause substantial injury to its consumers.

**PARTIES**

8.     Plaintiff Melissa Rader is a natural person and a citizen and resident of Manassas, Virginia. Plaintiff has had a checking account with Defendant at all material times hereto.

9.     Defendant is a credit union with over $4.1 billion in assets. Defendant maintains its headquarters and principal place of business in Herndon, Virginia. Among other things, Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the Class, in this District.

**JURISDICTION AND VENUE**

10.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     This Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Classes exceed $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Classes that are comprised of over one hundred members, and because at least one of the members of the proposed Classes is a citizen of a different state than Defendant.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendant maintains its headquarters in this District and so a substantial part of the events or omissions giving rise to Plaintiff's claim occurred and continue to occur in this District.

**BACKGROUND FACTS**

13.     Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. Overdraft Revenue Inches Up in 2018, https://bit.ly/3cbHNKV.

14.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

15.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

16.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

17.     The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313.

18.     In its latest issue of Consumer Compliance Supervisory Highlights, the FDIC again addressed the charging of multiple non-sufficient funds fees for transactions presented multiple times against insufficient funds in the customer's account. *See* FDIC Consumer Compliance Supervisory Highlights, Mar. 2022. FDIC examiners have scrutinized this issue in recent exams, with some exams remaining open pending resolution of the issue.

19.     In the Supervisory Highlights, the FDIC discussed potential consumer harm from this practice in terms of both deception and unfairness under the Federal Trade Commission Act Section 5's prohibition on unfair or deceptive acts or practices. The FDIC stated that the "failure

to disclose material information to customers about re-presentment practices and fees" may be deceptive.

20.    During 2021, the FDIC identified consumer harm when financial institutions charged multiple NSF fees for the re-presentment of unpaid transactions. Terms were not clearly defined and disclosure forms did not explain that the same transaction might result in multiple NSF fees if re-presented. While case-specific facts would determine whether a practice is in violation of a law or regulation, the failure to disclose material information to customers about re-presentment practices and fees may be deceptive. This practice may also be unfair if there is the likelihood of substantial injury for customers, if the injury is not reasonably avoidable, and if there is no countervailing benefit to customers or competition. For example, there is risk of unfairness if multiple fees are assessed for the same transaction in a short period of time without sufficient notice or opportunity for consumers to bring their account to a positive balance.

21.    In its staff analysis of the issue, the American Bankers Association recommended that banks review their deposit account agreement to ensure it states clearly that a separate NSF fee will be assessed whenever the same item is resubmitted against insufficient funds. ABA also encouraged banks, if scrutinized by a regulator, to explain the significant logistical challenges with identifying items that have been resubmitted by the merchant for payment against insufficient funds. ABA is updating its staff analysis of this issue to reflect the Supervisory Highlights.

22.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if an item is reprocessed for payment multiple times.

23.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.     DEFENDANT ASSESSES TWO OR MORE FEES ON THE SAME ITEM RETURNED FOR INSUFFICIENT FUNDS

24.     Defendant unlawfully maximizes its already profitable fees through the deceptive and contractually-prohibited practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, on an item.

25.     Unbeknownst to consumers, when Defendant reprocesses an electronic payment item, ACH item, or check for payment after it was initially rejected for insufficient funds, Defendant chooses to treat it as a new and unique item that is subject to yet another fee. But Defendant's contract never states that this counterintuitive and deceptive result could be possible and, in fact, promises the opposite.

26.     The Contract allows Defendant to take certain steps when paying a check, electronic payment item, or ACH item when the accountholder does not have sufficient funds to cover it. Specifically, Defendant may (a) pay the item and charge a fee; or (b) reject the item and charge a fee.

27.     In contrast to the Contract, however, Defendant regularly assesses two or more fees on an item.

### A.     The Imposition of Multiple Fees on a Single Item Violates Defendant's Express Promises and Representations

28.     The Contract states:

**ACH Overdraft and Returned ACH**                    $32.50 **each**

[. . .]

**Returned Check (due to non-sufficient funds)**                    $32.50

Ex. A (emphasis added).

29.    The Contract therefore promises that Defendant will assess a fee on "each" (singular) "ACH Overdraft" (singular), "Returned ACH" (singular), or "Returned Check" (singular).

30.    In breach of this promise, Defendant assesses multiple fees on an item.

31.    The same item on an account cannot conceivably become a new one when it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

32.    There is zero indication anywhere in the Contract that the same item is eligible to incur multiple fees.

33.    Even if Defendant reprocesses an instruction for payment, it is still the same item. Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

34.    The Contract never discusses a circumstance where Defendant may assess multiple fees for a single check, electronic payment item, or ACH item that was returned for insufficient funds and later reprocessed one or more times and returned again.

35.    In sum, Defendant promises that one fee will be assessed on an item, and this term must mean all iterations of the same instruction for payment. As such, Defendant breached the Contract when it charged more than one fee per item.

36.     Reasonable consumers understand any given authorization for payment to be one, singular item.

37.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same item will be treated as the same item, which Defendant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere do Defendant and its customers agree that Defendant will treat each reprocessing of a check, electronic payment item, or ACH item as a separate item, subject to additional fees.

38.     Customers reasonably understand, based on the language of the Contract, that Defendant's reprocessing of checks, electronic payment items, and ACH items are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger fees. In other words, it is always the same item.

39.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

40.     For example, Community Bank, NA, discloses its fee practice in its online banking agreement as follows:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. ***You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.***

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank N.A. 5 (Nov. 12, 2019), https://bit.ly/3uQafe7 (emphasis added).

41.     Defendant's Contract provides no such authorization, and actually promises the opposite— Defendant may charge, at most, a fee, per item.

**B.      Plaintiff's Experience**

42.      In support of Plaintiff's claim, Plaintiff offers an example of a fee that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

43.      On or around January 18, 2022, Plaintiff attempted payment of a single item for $700.00.

44.      Defendant returned payment of that item and charged a $32.50 fee for doing so.

45.      Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around January 20, 2022, Defendant processed the item again, this time rejected the item, and charged Plaintiff a second $32.50 fee for doing so.

46.      Defendant knew that this transaction was a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

47.      Then, on January 24, 2022, unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, Defendant processed the item for *a third time* and assessed Plaintiff a *third* $32.50 fee.

48.      Defendant knew that this transaction was also a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

49.      *In sum, Defendant charged Plaintiff $97.50 in fees on an item.*

50.      Plaintiff understood the payment to be a single item, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

**II.      DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS**

**A.  The Contract**

51.    At all times material hereto, Plaintiff had a checking account governed by the Contract.

52.    The Contract is a standardized form contracts for deposit accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all of its deposit account customers.

**B.  Overview of the Claim**

53.    Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

54.    Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

55.    However, Defendant still assesses crippling OD Fees on many of these transactions and misrepresents its practices in the Contract.

56.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same

transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

57.    Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

58.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

59.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

60.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

61.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

62.    There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune

of millions of dollars each year.

63.    But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

64.    Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### C.  Mechanics of a Debit Card Transaction

65.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

66.    At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

67.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

68.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time

comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

69.    There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**D.  Defendant's Contract**

70.    Plaintiff had a Defendant checking account at all times material hereto, which was governed by the Contract. Exs. A-B.

71.    Defendant promises that "[A]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it for you." Ex. B.

72.    In breach of this promise, Defendant assesses OD fees when there is "enough money" in the account "to cover" "a transaction."

73.    For debit card transactions, Defendant decides whether to pay a debit card transaction at the moment of authorization. Defendant represents to its customers that authorization and Defendant's payment of overdrafts is one step, just like consumers using debit cards believe.

74.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

75.    Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit

card transaction:

> We do ***authorize and pay*** overdrafts for the following types of transactions:
>
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We do not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):
>
> - ATM Transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction. If we do not ***authorize and pay*** an overdraft, your transaction will be declined.
>
> . . .
>
> **What if I want Northwest Federal Credit Union to *authorize and pay* overdrafts on my ATM and everyday debit card transactions?**
>
> If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions . . .
>
> [ ] Opt-out for all MPP overdraft practices. I do not want Northwest Federal to ***authorize and pay*** overdrafts on my checks and other transactions using my checking account number, automated bill payments, ATM and everyday debit card transactions.
>
> [ ] I do not want Northwest Federal to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.
>
> [ ] I want Northwest Federal to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. B (emphasis added and removed from original).

76.     In total, Defendant links payment to authorization ***nine times***, meaning that transactions are paid, and therefore overdrafts are determined, at authorization.

77.     The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit

card to pay for an item. Of course, that is not true for APSN Transactions.

78.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

79.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

80.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

81.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

82.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

83.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

84.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

85.    At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

86.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

87.    This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

88.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

89.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

90.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

91.    For example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

> Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100.Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://bit.ly/3kX0iXo (emphasis in original).

92.     Defendant and its accountholders make no such agreement.

**E. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

93.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

94.     Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

95.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

96.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is

no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

97.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

98.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

99.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

100.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

101.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

102.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

103.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance."

*Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

104.    Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

105.    Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

106.    Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

### F. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

107.    On or around January 8, 2022, Plaintiff was assessed $29.50 OD Fees on debit card transactions that settled that day, even though the transactions had been previously authorized on a sufficient available balance.

108.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed OD Fees.

109.    Plaintiff was also assessed OD Fees on debit card transactions that had been previously authorized on a sufficient available balance numerous other times in January 2022.

### III.    NONE OF THESE FEES WERE ERRORS.

110.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

111.    Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

112.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## IV.    THE IMPOSITION OF THESE FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

113.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Defendant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Defendant has a duty to honor payment requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor.

114.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

115.    When Defendant charges these fees, it uses its discretion in a way that violates common sense and reasonable consumer expectations and directly causes more fees.

116.    In addition, Defendant exercises its discretion in its own favor and to the prejudice of Plaintiff and its other customers. Further, Defendant abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Contract. This is a breach of Defendant's duty to engage in fair dealing and to act in good faith.

117.    It was bad faith and totally outside of Plaintiff's reasonable expectations for Defendant to use its discretion to assess improper fees.

118.    Defendant abuses its discretion and acts in bad faith by defining terms in an unreasonable way that violates common sense.

## CLASS ALLEGATIONS

119.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes pursuant to Federal Rule of Civil Procedure 23:

The Multiple Fee Class: All persons who, during the applicable statute of limitations period through the present, were assessed multiple fees on an item on a Defendant checking account.

The APSN Fee Class: All Defendant checking accountholders who, during the applicable statute of limitations, were checking account holders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized (the "APSN Class").

The Regulation E Class: All US residents who have or have had accounts with Defendant who were opted into the overdraft program for ATM and non-recurring debit card transactions through the use of an opt-in agreement which provided inaccurate or misleading information on Defendant's overdraft program in violation of Regulation E, and were assessed overdraft charges resulting from ATM and/or non-recurring debit card transactions since August 15, 2010 (the "Regulation E Class").

120.    Plaintiff reserves the right to modify or amend the definition of the Classes as this litigation proceeds.

121.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

122.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

123.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

124.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in that he has been assessed unlawful overdraft fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

125.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

126.    Among the questions of law and fact common to the Classes include:

   a.   Whether Defendant assesses multiple fees on an item;

   b.   Whether Defendant assessed OD Fees on APSN transactions;

   c.   Whether Defendant had standardized Opt-In Agreements during the Class period that were provided to its customers;

   d.   Whether Defendant's conduct breached the Opt-In Agreement;

   e.   Whether Defendant's conduct violated 12 C.F.R. § 1005.17;

   f.   Whether the fee practices alleged herein breach the Contract;

   g.   Whether Defendant breached its covenant of good faith and fair dealing through its fee policies and practices as described herein;

   h.   Whether Defendant was unjustly enriched as a result of these fee assessment practices;

   i.   The proper method or methods by which to measure damages; and

   j.   The declaratory and injunctive relief to which the Classes are entitled.

127.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

128.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

129.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

130.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

## CAUSE OF ACTION ONE
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
#### *(On Behalf of Plaintiff and the Classes)*

131.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

132.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract.

133.    All contracts entered by Plaintiff and the Classes are identical or substantively identical because Defendant's form contracts were used uniformly.

134.    Defendant has breached the express terms of its own agreements as described herein.

135.    Under Virginia law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

136.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

137.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

138.    Defendant abused the discretion it granted to itself when it charged multiple fees on an item.

139.    Defendant also abused the discretion it granted to itself when it charged OD Fees on APSN transactions.

140.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

141.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

142.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

143.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the agreements.

144.    Plaintiff and members of the Classes have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

145.    Plaintiff and the members of the Classes are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## CAUSE OF ACTION TWO
### Unjust Enrichment
**(*On behalf of Plaintiff and the Classes*)**

146.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

147.    Plaintiff, individually and on behalf of the Class, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason.  In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

148.    Plaintiff and members of the Classes conferred a benefit on Defendant at the expense of Plaintiff and members of the Classes when they paid improper fees.

149.    Defendant appreciated this benefit in the form of the substantial revenue that Defendant generates from the imposition of such fees.

150.    Defendant has accepted and retained such fees under inequitable and unjust circumstances.

151.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Classes and should be required to make restitution to Plaintiff and members of the Class.

**CAUSE OF ACTION THREE**
**VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT**
(***On Behalf of Plaintiff and the Regulation E Class***)

152.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

153.    Because Defendant's misrepresentations and material omissions as to the operation of the overdraft program, any consent that Defendant obtained for  members of the Regulation E Class's participation in the program was fraudulently induced.

154.    Because the opt-in form was breached and/or consent to participation was fraudulently induced, Defendant failed to comply with 12 C.F.R. § 1005.17, which requires affirmative consent.

155.    Because of Defendant's failure to comply with 12 C.F.R. § 1005.7, it is liable for actual and statutory damages, as well as attorney fees and costs of suit pursuant to 12 U.S.C. 1693m.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.      Certification for this matter to proceed as a class action;

b.      Designation of Plaintiff as the Class Representative and designation of the undersigned as Class Counsel;

c.      Restitution of all improper fees paid to Defendant by Plaintiff and the Classes because of the wrongs alleged herein in an amount to be determined at trial;

d.      Declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful to the extent they are inconsistent with the Contract;

e.      Enjoining Defendant from engaging in the practices outlined herein so long as they remain inconsistent with the Contract;

f.      Actual damages in amount according to proof;

g.      Pre- and post-judgment interest at the maximum rate permitted by applicable law;

h.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

i.      Grant Plaintiff and the Classes a trial by jury;

j.      Grant leave to amend these pleadings to confirm to evidence produced at trial; and

k.      Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff, by counsel, demands trial by jury.

Date: February 3, 2023

Respectfully submitted,

*s/ Devon J. Munro*
**MUNRO BYRD, P.C.**
Devon J. Munro (VSB #47833)
120 Day Ave. SW, First Floor
Roanoke, VA 24016
Telephone:  (540) 283-9343
Facsimile:   (540) 328-9290
Email:  dmunro@trialsva.com

**KALIELGOLD PLLC**
Sophia G. Gold*
950 Gilman Street, Suite 200
Berkeley, CA 94710
Telephone: (202) 350-4783
sgold@kalielgold.com

Jeffrey D. Kaliel*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 280-4783
jkaliel@kalielgold.com

**JOHNSON FIRM**
Christopher D. Jennings*
Tyler B. Ewigleben*
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com

*\* Pro Hac Vice* applications to be submitted
*Counsel for Plaintiff and the Proposed Classes*