IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MELISSA RADER, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:23-cv-160 (RDA/JFA) |
| NORTHWEST FEDERAL CREDIT UNION, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Northwest Federal Credit Union's Motion to Dismiss and to Compel Arbitration (Dkt. 5). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with Defendant's Memoranda in Support (Dkt. 6), Plaintiff Melissa Rader's Opposition Brief (Dkt. 13), her Addendum to her Opposition Brief (Dkt. 15), Defendant's Reply Brief (Dkt. 18), and both parties Sur-Replies (Dkt. Nos. 32; 33), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.[1]

---

[1] The Motion to Dismiss is based on Rules 12(b)(1) and 12(b)(6) as well as the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* Because the Court finds that the causes of action in the Complaint are subject to arbitration, the Court does not address Defendant's Rule 12(b)(6) arguments and those arguments are denied as moot.

## I.  BACKGROUND

### A.  Factual Background

Defendant is a credit union with its principal place of business in Herndon, Virginia and is engaged in the business of providing retail banking services to consumers. Dkt. 1 ¶ 9.  Plaintiff is a natural person and a resident of Manassas, Virginia who has a checking account with Defendant. *Id.* ¶ 8.

Plaintiff alleges that Defendant improperly assessed and collected overdraft fees on debit card transactions authorized on sufficient funds and assessed and collected multiple fees on a single item. *Id.* ¶ 1.  Plaintiff alleges that these charges: (i) violate Regulation E of the Electronic Fund Transfer Act, 12 C.F.R. § 1005.17; (ii) constitute breaches of Defendant's duty of good faith and fair dealing; and (iii) unjustly enrich Defendant. *Id.* ¶ 2.

Plaintiff asserts that Defendant "unlawfully maximizes its already profitable fees through the deceptive and contractually-prohibited practice of charging multiple NSF [Overdraft and insufficient funds] fees, or an NSF fee followed by an overdraft fee on an item." *Id.* ¶ 24.  Plaintiff further asserts that, when Defendant reprocesses a payment after it was initially rejected for lack of sufficient funds, Defendant treats it as a new item subject to another fee." *Id.* ¶ 25.  Plaintiff asserts that this violates the contracts that Defendant enters into with customers and she has attached those contracts that she contends are at issue to her Complaint. *Id.*; *see also* Dkt. Nos. 1-2 and 1-3.  Plaintiff asserts that the contracts promise that Defendant will assess a single fee on each ACH[2] Overdraft, Returned ACH, or Returned Check.

---

[2] Although ACH is an undefined term in the Complaint, it appears to stand for "Automated Clearing House." Bureau of the Fiscal Service, "Automated Clearing House," https://www.fiscal.treasury.gov/ach/#:~:text=The%20Automated%20Clearing%20House e%20(ACH,and%20payments%20are%20made%20online (last visited, January 4, 2024).

Plaintiff specifically asserts that on January 18, 2022, when she attempted a payment of $700.00, Plaintiff was charged a $32.50 fee. Dkt. 1 ¶¶ 43-44. Then, without a request from Plaintiff, Defendant reprocessed the payment on January 20, 2022 and charged a second $32.50 fee. *Id.* ¶ 45. On January 24, 2022, Defendant again reprocessed the payment and charged another $32.50 fee. *Id.* ¶ 46.

Plaintiff summarizes her claim as follows: She asserts that she is challenging overdraft fees on what she refers to as "Authorize Positive, Settle Negative Transactions" or "APSN Transactions." *Id.* ¶ 53. Plaintiff alleges that, "the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's 'available balance.'" *Id.* ¶ 54. But Defendant will still assess overdraft fees on those same transactions when they settle days later into a negative balance. *Id.* ¶ 56. Plaintiff asserts that, when subsequent transactions are initiated, they are compared against an account balance that has already been reduced to account for the pending debit card transaction, and therefore subsequent transactions may incur overdraft fees due to the unavailability of the funds held for the earlier debit card transaction; but, Defendant will also charge an overdraft fee on the debit-card transaction despite having the funds reserved and keeping the held funds off-limits for other transactions. *Id.* ¶¶ 59-60.

Plaintiff asserts that the charging of overdraft fees on such pending debit-card transactions is a breach of Defendant's promise to only charge fees when consumers do not have enough funds in their account for the transaction. *Id.* ¶¶ 71-74. Plaintiff alleges that, "at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same

transaction a second time." *Id.* ¶ 86.  Plaintiff asserts that, in this way, Defendant is able to charge overdraft fees on the debit-card transactions, even though at the time of the transaction there were sufficient funds to cover the payment.  *Id.* ¶ 87.  Plaintiff asserts that this practice is inconsistent with the immediate withdrawal of funds for debit card transactions and is deceptive. *Id.* ¶¶ 93-95.

Relying on these factual allegations, Plaintiff asserts three causes of action on behalf of herself and the putative class members:[3] (i) breach of contract, including breach of the covenant of good faith and fair dealing; (ii) unjust enrichment; and (iii) violation of the Electronic Funds Transfer Act. *Id.* ¶¶ 131-155.

## B.   Background Relevant to Arbitration

Defendant contends that Plaintiff's claims are subject to arbitration.  With respect to that portion of the Motion, the parties submitted various evidence.

Plaintiff opened her Northwest account on May 7, 2012.  Dkt. 6-1 ¶ 5.  Prior to December 2013, Plaintiff provided Defendant with consent to provide her monthly statements by posting them to her Northwest online banking account.  *Id.* ¶ 6.  The 2013 eStatement Enrollment Agreement provides "consent to accept periodic account statements in an electronic format rather than a paper format."  Dkt. 32-1. On November 15, 2019, Plaintiff executed a "Membership Application & Update Form" to reflect her change of address to 9006 Opera Alley, Manassas, Virginia 20110.  *Id.* ¶ 7; Dkt. 6-2 (the "Update Form").   By signing the form, Plaintiff acknowledged her "receipt of the Account Agreements & Disclosures, Funds Transfer Agreement,

---

[3] Plaintiff asserts that there are three putative classes: (i) persons who were assessed multiple fees on an item (the "Multiple Fee Class"); (ii) persons who were checking account holders with Defendant and were assessed an overdraft fee on a APSN transaction (the "APSN Class"); and (iii) persons who had accounts with Defendant and were opted into the overdraft program for certain transactions (the "Regulation E Class").  Dkt. 1 ¶ 119.

and Fee Schedule." Dkt. 6-2 at 2.  As of November 2018,[4] Defendant's Account Agreement & Disclosures (the "2018 Membership Agreement") contained an arbitration provision, which provided: "Any controversy or claim arising out of or relating to your account(s) and/or loan account(s), except as prohibited by law, shall be settled by binding arbitration." Dkt. 6-3.  The 2018 Membership Agreement also contained a clause governing amendments and providing for notice "by 5 days advance notice to you at the last address shown . . . , by posting notices in branches . . . , or as otherwise permitted by law" and that by continuing to use Defendant's services thereafter Plaintiff was indicating her consent to such amendments.  *Id.* at 23.

On November 13, 2020, Defendant disseminated an email to members indicating that changes were being made to its account agreements and specifically highlighting that "revisions include . . . [a] mandatory arbitration and class action prohibition" and contained blue, underlined hyperlinks to the 2020 Membership Agreement. Dkt. Nos. 18-3 ¶¶ 6-11; 18-4 ("2020 Membership Agreement"); 18-5 ("November 13, 2020 Email").  Because Plaintiff had consented to receive updates electronically, Plaintiff was on the list of customers to receive the November 13, 2020 Email.  Dkt. 18-3 ¶¶ 12-14.

On July 7, 2021, Defendant amended the agreement again. Dkt. 6-4 ("2021 Membership Agreement").   The 2021 Membership Agreement also included an arbitration provision: "**ARBITRATION AND WAIVER OF CLASS ACTION RELIEF.** . . . In the event of any controversy or claim arising out of or relating to these Agreements and Disclosures, or the breach thereof . . . You may, at Your option, pursue your remedies through binding arbitration." *Id.*  The

---

[4] Defendant's Memorandum refers to the agreement as the 2019 Membership Agreement, but the agreement itself makes clear that it was current as of November 2018.  Dkt. 6-3. Accordingly, the Court will refer to the agreement as the 2018 Membership Agreement.

2021 Membership Agreement further provides: "All parties hereby waive and give up all rights to a jury trial and the right to participate in a class action or similar proceeding." *Id.* at 3.

Defendant asserts that Plaintiff was provided notice of the 2021 Membership Agreement on her April 2021 Account Statement, which informed Plaintiff that the terms and conditions governing her account had changed and directing Plaintiff to the disclosures via a link on the website. Dkt. 6-5. Defendant further asserts that the April 2021 Account Statement was posted to Plaintiff's account on May 1, 2021 and that, after the statement posted, Plaintiff continued using her account. Dkt. Nos. 6-1 ¶¶ 9-20; 6-6.

Plaintiff asserts that her original 2012 Membership Agreement did not contain an arbitration provision or class action waiver. Dkt. 13-1. Plaintiff further asserts that, pursuant to the 2012 Membership Agreement, modifications required 30-day written notice and that "Notice may be given by U.S. mail, first class, postage prepaid to your last known address, as reflected in Northwest Federal Credit Union's records." *Id.*

Plaintiff admits that, in November 2019, she visited a Northwest branch to update her mailing address. Dkt. 13-2. Plaintiff asserts, however, that no one provided her with any documents, let alone a copy of the latest membership agreement. *Id.*

### C. Procedural Background

On February 3, 2023, Plaintiff filed her Complaint. Dkt. 1. On April 5, 2023, Defendant filed its Motion to Dismiss and to Compel Arbitration. Dkt. 5. On June 14, 2023, Plaintiff filed her Opposition Brief. Dkt. 13. On June 20, 2023, Plaintiff filed an Addendum to her Opposition Brief. Dkt. 15. On July 5, 2023, Defendant filed its Reply. Dkt. 18.

On July 10 and 11, 2023, Plaintiff filed motions seeking an extension of time to file a sur-reply as well as seeking to strike new arguments and exhibits from Defendant's Reply. Dkt. Nos.

6

19; 20; 22; 23. Defendant opposed those motions. Dkt. Nos. 24; 25. On July 27, 2023, the parties filed a joint motion indicating that they had resolved the issues presented by Plaintiff's motions and seeking the issuance of an agreed upon briefing schedule of sur-replies. Dkt. 30. Magistrate Judge John F. Anderson entered the Agreed Order that same day. Dkt. 31. On August 23, 2023, Plaintiff filed her Sur-Reply. Dkt. 32. Finally, on August 29, 2023, Defendant filed its Sur-Reply. Dkt. 33.

## II.  STANDARD OF REVIEW

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure Rule 12(b)(1) provides for the dismissal of an action if the Court lacks subject matter jurisdiction. In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is supported. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

There are two ways in which a defendant may prevail on a 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject-matter jurisdiction may be based." *Adams*, 697 F.2d at 1219. Under this method of attack, all facts as alleged by the plaintiff are assumed to be true. *Id.* However, conclusory statements and legal conclusions in a complaint are not entitled to a presumption of truth. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). Under this latter approach, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

### B. Compelling Arbitration

Congress passed the Federal Arbitration Act ("FAA") "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000) (quoting *Gilmer v. Interstate/ Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The effect of th[is] section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

### III. ANALYSIS

Defendant styles his motion to compel arbitration as a motion to dismiss for lack of subject matter jurisdiction, arguing that, because Plaintiff is required to arbitrate her claims, this Court is deprived of subject matter jurisdiction. Defendant's argument misunderstands the interplay between the FAA and subject matter jurisdiction. The Court will first address the issue of subject matter jurisdiction, then turn to the question of whether this case should be dismissed in favor of arbitration.

8

A. Subject Matter Jurisdiction

Despite strong federal policy favoring arbitration, the FAA does not divest federal courts of otherwise-possessed subject matter jurisdiction over disputes subject to arbitration agreements. *See City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 880–81 (8th Cir. 2017) ("[A]n arbitration agreement has no relevance to the question of whether a given case satisfies constitutional or statutory definitions of jurisdiction."); *see also Schwartz v. Coleman*, 987 WL 38184 (4th Cir. 1987); *Auto. Mech. Local 701 v. Vanguard Car Rental,* 502 F.3d 740, 743 (7th Cir. 2007) ("Enforcement of a forum selection clause (including an arbitration clause) is not jurisdictional . . . ."). While a plaintiff's failure to comply with contract terms that require arbitration typically bar the plaintiff's ability to then sue in federal court, "it does not affect whether the *district court* possesses the power to hear the case." *Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13cv442, 2013 WL 5962939 at *3 (E.D. Va. 2013) (emphasis in original). As judges in this District recognize, "an obligation to arbitrate would impair [Plaintiff's] right of access to the Court, but it does not impact the Court's independent jurisdiction" because "subject-matter jurisdiction . . . can never be forfeited or waived." *Colonial River Wealth Advisors, LLC v. Cambridge Inv. Res., Inc.*, 2023 WL 4708086, at *4 (E.D. Va. July 24, 2023) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)). On that basis, the Court finds that Defendant has not established grounds for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).

B. Whether this Dispute is Subject to Arbitration

Nonetheless, the Fourth Circuit has held that dismissal is appropriate where all of the issues presented in a lawsuit are subject to arbitration. *See Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) ("Notwithstanding the terms of § 3 [of the FAA], however, dismissal is a proper remedy when all of the issues presented in a lawsuit are

9

arbitrable."); *Greenville Hosp. Sys. v. Emp. Welfare Ben. Plan for Emps. of Hazelhurst Mgmt. Co.*, 628 F. App'x 842, 845-46 (4th Cir. 2015) (affirming dismissal and holding that when "a court determines, after applying this presumption in favor of arbitration, that all of the issues presented are arbitrable, then it may dismiss the case, as the district court did here"). The Fourth Circuit has further directed that, a determination of whether a dispute is subject to arbitration, requires demonstration of four elements: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction to interstate commerce; and (4) the failure or refusal of a party to arbitrate the dispute. *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 n.6 (4th Cir. 2012). Here, Defendant contends that any of the three arbitration provisions to which Plaintiff agreed would require arbitration of this case. Plaintiff, by contrast, denies that she agreed to any arbitration provision.

### i. *2018 Membership Agreement*

All parties agree that they were both bound by the 2012 Membership Agreement when Plaintiff opened her account and that the 2012 Membership Agreement did not contain an arbitration clause. The first question therefore is whether Plaintiff was bound by the 2018 Membership Agreement, which introduced the arbitration clause.

The 2012 Membership Agreement provided that the agreement may be amended from time to time, upon 30-day notice. Dkt. 13-1 at 7. The 2012 Membership Agreement then provided: "Notice *may* be given by U.S. mail, first class, postage prepaid to your last known address." *Id.* (emphasis added). Plaintiff relies on this provision to argue that Defendant cannot satisfy its burden that Plaintiff agreed to arbitrate unless Plaintiff was sent copies of the subsequent amendments containing the arbitration provision "as was required by the modification provision

in Northwest's 2012 Membership Agreement." Dkt. 32 at 5. But Plaintiff reads too much into the 2012 Membership Agreement. The 2012 Membership Agreement provides that Defendant *may* give notice of a change by mail. As the Supreme Court of Virginia has held, "the words used in the contract as written must be given their plain meaning." *Graham v. Commonwealth*, 206 Va. 431, 436 (1965). The word "may," as opposed to the word "shall" is permissive and does not impose a mail requirement on Defendant. *Air Line Pilot Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 2009 WL 2708009, at *5 (E.D. Va. Aug. 25, 2009) (contrasting the use of the word "may" and "shall" with respect to statutory interpretation). Thus, Defendant could have provided written notice of amendment in a myriad of ways.

The Court need not determine whether Plaintiff received proper notice of an amendment because Plaintiff affirmatively manifested her assent to the 2018 Membership Agreement and therefore modified her contract. In the Update Form, Plaintiff "agree[d] to be bound by and conform to the by-laws, rules, regulations, and policies now in effect and as amended or adopted in the future by Northwest." Dkt. 6-2. Plaintiff further represented "that all the information on this Application is true and correct under penalty of perjury and acknowledge receipt of the Account Agreements & Disclosures, Funds Transfer Agreement and Fee Schedule." *Id.* Plaintiff then signed the Update Form. *Id.* As the Supreme Court of Virginia has held, "[w]e ascertain whether a party assented to the terms of a contract from that party's words or acts." *Phillips v. Mazyck*, 273 Va. 630, 636 (2007). Here, Plaintiff affirmatively manifested her intent to be bound by the account agreement operable in 2019, which was the 2018 Membership Agreement, and affirmatively stated, under penalty of perjury, that she received a copy of that agreement. Thus, Plaintiff is bound by the 2018 Membership Agreement and the arbitration clause that it contains.

11

Seeking to avoid this conclusion, Plaintiff now claims that Defendant failed to provide her with copies of the 2018 Membership Agreement, despite her swearing to that fact in the Update Form. Dkt. 13 at 5. But Plaintiff cannot create a dispute of fact by attacking her own sworn statements. *See, e.g., Laber v. Austin*, 2023 WL 2579466, at *10 (E.D. Va. Mar. 20, 2023) (collecting cases). Thus, it is not – as Plaintiff argues – Defendant's lawyers "concluding" that Plaintiff must have received the 2018 Membership Agreement, but Defendant and the Court relying on Plaintiff's sworn statement that she did. Moreover, in addition to contradicting her prior sworn statement, it strains credulity – given Plaintiff's deposition testimony[5] in this case – that Plaintiff clearly remembers not receiving the 2018 Membership Agreement when she does not remember other facts about signing the Update Form.[6] Other courts have held that contracts are valid in similar circumstances. *See, e.g., Gadberry v. Rental Servs. Corp.*, 2011 WL 766991, at *2 (D.S.C. Feb. 24, 2011) (holding that a signature was valid and enforceable even where plaintiff submitted affidavit that he "does not remember signing the contract, having the contract explained to him, or receiving copies of any of the materials mentioned in the contract"); *Ineman v. Kohl's Corp.*, No. 14-cv-398, 2015 WL 1399052, at *4 (W.D. Wisc. Mar. 26, 2015) (holding that "[b]ecause continued use of a credit card by the cardholder constitutes acceptance of the terms of the credit card agreement, courts routinely reject the essential argument made by plaintiff here—

---

[5] It is highly unusual for parties to proceed to discovery where there is a pending motion to dismiss and no order from the Court regarding discovery. In this case, however, it appears that the parties moved forward with discovery in the absence of any scheduling order.

[6] At her deposition, Plaintiff could not recall the month or day of the week on which she signed the Update form. Dkt. 18-1, Tr. 46:11-19; *id.* 50:22-52:1. Moreover, Plaintiff was even unclear on whether she signed the form. *Id.* Tr. at 50: 8-11 ("I believe I did. I believe I did. I'd have to see it to make sure, but I think – I know I filled the new address out, but, you know – I assume – I believe I did sign it.").

namely, that the agreement is unenforceable because she did not sign, read or receive the credit card agreement, or at least does not remember doing so"). Courts have even held that contracts are enforceable where the person to be bound does not read or go to a website where the terms of the contract are available. *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) ("Under ordinary contract principles, Tubal-Cain is therefore bound by those terms and conditions, even if neither Van Huis nor anyone else at Tubal-Cain ever visited Crowley's website in order to familiarize himself with those terms and conditions."); *Centrifugal Force, Inc. v. Softnet Commc'n Inc.*, No. 08 Civ. 5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) ("Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract."). Here, the Court is presented with Plaintiff's unequivocal statement, under penalty of perjury, both that she agreed to be bound by the current (in 2019) version of the account agreements and that she had received copies of the current agreement. That is sufficient for Defendant to establish that Plaintiff manifested her assent to the 2018 Membership Agreement, which contained an arbitration clause.

### ii. *2020 Membership Agreement*

Because this Court has determined that Plaintiff agreed to be bound by the 2018 Membership Agreement, whether Plaintiff is bound by the 2020 Membership Agreement is governed by the provision in the 2018 Membership Agreement regarding amendment. The 2018 Membership Agreement provides: "NWFCU has the right to modify this Funds Transfer Agreement at any time by 5 days written advance notice to you at the last address shown for your Primary Savings Account on NWFCU's records, by posting notice in branches of NWFCU, or as otherwise permitted by law." Dkt. 6-3 at 21. This provision is the one cited by the parties. Dkt. 6 at 4. A second provision of the 2018 Membership Agreement is even broader and provides:

13

"Northwest Federal Credit Union may change the terms and conditions of this Account without written notice, unless required by law.  If notice is required, it *may* be given by U.S. mail, first class, postage prepaid to your last known address . . . ."  Dkt. 6-3 at 7 (emphasis added).[7]  As discussed *supra*, the word "may" is permissive.  Thus, if notice satisfies the "otherwise permitted by law" requirement, such notice also satisfies the notice requirement contained in this provision.

Here, Defendant asserts that Plaintiff was provided with notice of amendment on November 13, 2020 when it emailed notice of the 2020 Amendment and specifically highlighted the arbitration and class action prohibition clauses.  Dkt. 18-5.  The parties do not address what "otherwise permitted by law" means with respect to notice under the 2018 Membership Agreement.  But numerous courts have recognized that email notice is sufficient to provide notice under contracts.[8]  Courts have also concluded that emails, combined with a course of conduct, can be sufficient to create a contract.  *See, e.g., Protherpy Assocs., LLC v. AFS of Bastian, Inc.*, 2010 WL 2696638, at *2 (W.D. Va. July 7, 2010) (concluding that an email agreement sufficiently altered a prior contract).  Here, the November 13, 2020 Email that Defendant sent specifically calls

---

[7] Although some states permit parties to agree to authorize one party to modify a contract unilaterally without notice, *Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *5-*6 (N.D. Ill. May 15, 2020), Defendant cited no Virginia authority that would permit Defendant to make changes without notice and, indeed, Defendant does not argue that it made any changes pursuant to this provision.

[8] *See, e.g., Cooper/Ports America, LLC v. Sec'y of Defense*, 959 F.3d 1373, 1375 (Fed. Cir. 2020) (finding that an email was sufficient to satisfy a notice requirement); *Global Fitness Holdings, LLC v. Federal Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1176, 1192 (D. Utah 2015) (finding that email notice satisfied contractual notice provision, even though contract specifically provided that notice *may* be provided by mail); *Corbin v. Affiliated Computer Servs., Inc.*, 2013 WL 3804862, at *14 (M.D. Fla. July 19, 2013) ("I find nothing objectionable about the use of email to notify employees of changes in their contracts of employment of employment so long as the email is sufficient to put a reasonable employee on inquiry notice that an alteration in the employment relationship is being made.").

customers' attention to the fact that the email is about "Account Agreements and Disclosures" and specifically notes: (i) "we have updated our Agreement and Disclosures"; (ii) provides hyperlinks to the Agreement and Disclosures; (iii) highlights that changes include "mandatory arbitration" and a "class action prohibition; (iv) recommends that customers read the hyperlinked agreement in its entirety; and (v) warns customers that "[y]our continued use or maintenance of your account constitutes your agreement to these terms." Dkt. 18-5. This constitutes sufficient notice under the 2018 Membership Agreement.

The next question is whether *Plaintiff* received the email. Defendant submits the Declaration of Edward Hollingsworth to establish: (i) that Defendant sent the November 13, 2020 Email; (ii) that the November 13, 2020 Email was sent to everyone who opted-in to receive account statements and updates *via* email; (iii) that Plaintiff provided Defendant with consent to provide electronic account statements; (iv) that Plaintiff's email, mlr9162@yahoo.com, was included on the list of recipients of the November 13, 2020 Email; and (v) that the Plaintiff continued using her account after receiving the email. Dkt. 18-3. Plaintiff appears to concede that she consented to receive account statements via e-noticing but denies that she consented to receive account updates via e-noticing. Dkt. 32 at 8-9.[9] Plaintiff neither confirms nor denies receipt of the November 13, 2020 Email in her Sur-Reply nor does Plaintiff provide a Declaration denying receipt of the November 13, 2020 Email. *Id.* Thus, Defendant's evidence that Plaintiff's email address – which is specifically identified – was included on the list of all customers to receive the

---

[9] Plaintiff's argument that she did not explicitly agree to receive account updates via e-noticing is somewhat of a red herring. Plaintiff points to no statute or case authority that would require her to consent to such notice. Moreover, as discussed *supra*, what matters is whether email notice of material changes to a contract can be effective – they can – and that they constitute appropriate notice pursuant to the 2018 Membership Agreement – they do.

email is sufficient circumstantial evidence, in the face of no contrary evidence,[10] to establish that Plaintiff received the November 13, 2020 Email. Because Plaintiff received sufficient notice and then continued to use her account, Plaintiff is bound by the 2020 Membership Agreement, including its arbitration provision and prohibition on class actions.

This case closely resembles another case brought in this District and decided by former U.S. District Judge Gerald Bruce Lee. In *Klein v. Verizon Commc'ns, Inc.*, No. 1:12-cv-757, 2017 WL 5071306 (E.D. Va. Aug. 9, 2017), Verizon sent the plaintiff an email notifying him of a change to a prior agreement, which for the first time required that the parties arbitrate any dispute, and provided plaintiff with hyperlinks to the new terms. *Id.* at *2. The *Klein* plaintiff asserted that he did not open the email. *Id.* Applying Virginia law, Judge Lee held that the plaintiff was on notice about the changes and "[h]is failure to read the 2012 Notification, or even open the message at all, does not invalidate his assent to the contents." *Id.* at *5 (citing *Camacho v. Holiday Homes, Inc.*, 167 F. Supp. 2d 892, 896 (W.D. Va. 2001). Judge Lee further held that, "because of Verizon's successful delivery of the 2012 Notification and Klein's continued use of Verizon's services between June 20 and July 10, 2012 reflect valid mutual acceptance of a contract modification under Virginia law, the Court grants Verizon's motion to compel arbitration." *Id.* Here, like in *Klein*, the evidence is that Defendant notified Plaintiff of the changes to the 2018 Membership Agreement in the November 13, 2020 Email and that continued use of Defendant's services would constitute acceptance. After the November 13, 2020 Email, Plaintiff continued to use Defendant's services. Accordingly, Plaintiff manifested her assent to the 2020 Membership Agreement and its terms and is bound by that 2020 Membership Agreement.

---

[10] *See Gregory W. v. North Star Capital Acquisition*, 2011 WL 13319083, at *5 (N.D. Ga. Nov. 15, 2011) (discussing cases where plaintiffs have not met their burden of providing some evidence to substantiate their denial of an agreement to arbitrate).

### iii. *2021 Membership Agreement*

Because Plaintiff agreed to the 2020 Membership Agreement, that agreement governs the notice required for any amendments to it.  The 2020 Membership Agreement provides: "This Agreement may be amended by Us at any time, in which case We will provide You with a notice of amended as required by law or regulation." Dkt. 18-4 at 4.  Here, Defendant asserts that Plaintiff received notice of amendments via her April 2021 monthly statement, which informed Plaintiff: "Please take notice that the terms and conditions of the 'Account Agreements and Disclosures' governing your accounts will be changing effective June 7th.  Visit nwfcu.org/disclosures to view the revised Agreement . . . ." Dkt. 6-5.  Defendant also asserts that Plaintiff received an email informing her that her April 2021 Statement was available to view.  Dkt. 6-1 ¶ 14.

Here, the Court agrees with Plaintiff that this does not provide adequate notice of an amendment to the 2020 Membership Agreement.  Defendant does not assert that any email sent to Plaintiff would notify Plaintiff of the modification to the 2020 Membership Agreement.  Nor does Defendant provide any evidence that Plaintiff saw the April 2021 Statement.  In fact, to the contrary, Defendant concedes that Plaintiff – unaware that her April 2021 Statement contained notice of changes to the 2020 Membership Agreement – did *not* view the April 2021 Statement. Dkt. 18 at 9-10 ("Plaintiff, by sheer dumb luck, did not view the April 2021 Statement." (citing Dkt. 18-2, Tr. at 38:18-39:3)).  Moreover, Defendant points to no contract language or course of dealing evidence to suggest that Plaintiff should expect to be notified of contract modifications via a note on a monthly bank statement that was not sent to Plaintiff but merely posted on Defendant's website.  This is especially true where previously Defendant sent Plaintiff an email specifically notifying Plaintiff of the amendments.  Dkt. 18-5.

Although Defendant correctly notes that some courts (applying the law of other states) have held that notices of amendments placed on a consumer's monthly statement are sufficient to bind the consumer, those decisions are not binding on this Court and Defendant does not rely on any Virginia case reaching such a result. Moreover, those cases are distinguishable. In *Needleman v. Golden 1 Credit Union*, 474 F. Supp.3d 1097 (N.D. Cal. 2020), the plaintiff had agreed to receive changes to the credit union's banking terms and conditions through the credit union's online portal. *Id.* at 1104. Here, Plaintiff only consented to receive banking statements through the portal and Plaintiff was not on notice that the statement itself could contain notice of changes to the 2020 Membership Agreement. Dkt. 6-1. Moreover, the *Needleman* defendant posted the Arbitration Provision separately in "a conspicuous link under the bold 'Statement Inserts" heading, visible without having to scroll." *Id.* Thus, it appears that any time that the *Needleman* plaintiff entered the website the plaintiff would be alerted to the change and the plaintiff would not have to open the monthly statement in order to be alerted to the change.[11]

This Court cannot find that Plaintiff was on inquiry notice with respect to the 2021 Membership Agreement because there is no evidence that: (i) Plaintiff agreed to receive notice of account agreement amendments via the website portal; (ii) Plaintiff ever opened the April 2021

---

[11] In *Rudolph v. Wright Patt Credit Union*, 175 N.E. 3d 636 (Ohio Ct. App. 2021), the customer also specifically agreed to receive changes to the defendant's membership agreement through its website. *Id.* at 650. This again is broader than the e-noticing to which Plaintiff is alleged to have agreed. Dkt. 6-1 ¶ 6 (noting that Plaintiff "provided Northwest with consent to provide her *monthly account statements* by posting them to her Northwest online banking account") (emphasis added). The *Rudolph* case also does not involve a course of dealing where the credit union had previously emailed the plaintiff to provide notice of changes to the agreement. Dkt. 6-5. Moreover, in *Hart v. Charter Commc'ns, Inc.*, 814 F.App'x 211 (9th Cir. 2020), there was "no dispute Hart received the relevant billing statements" upon which the changes were "sufficiently clear and conspicuous." *Id.* at 213. Here, there is no dispute that Plaintiff was never on notice that changes to the 2020 Membership Agreement might be conveyed on billing statements and that Plaintiff did not open the 2021 April Statement, which would have alerted her to the change.

18

Statement notifying her of the 2021 Membership Agreement; or (iii) Plaintiff was otherwise notified of the existence of the 2021 Membership Agreement. Accordingly, applying Virginia law, this Court cannot conclude that there was a meeting of the minds or that Plaintiff manifested here assent to the 2021 Membership Agreement and its terms. *See Giordano ex rel. Estate of Brennan v. Atria Assisted Living, Va. Beach, LLC,* 429 F. Supp. 2d 732, 736 (E.D. Va. 2006) ("This Court will not bind an individual to an arbitration clause in a contract . . . of which she was completely unaware.").

### iv. *Plaintiff's Causes of Action Are Covered by the Arbitration Clauses in the 2018 and 2020 Membership Agreements*

Both the 2018 Membership Agreement and the 2020 Membership Agreement were agreed to by Plaintiff and both contained arbitration clauses. The Court must therefore determine whether the specific claims at issue in this case are covered by those arbitration clauses.

It appears that Plaintiff does not dispute that, if the agreements are valid, then the arbitration clauses encompass her causes of action, because her briefs do not argue that her claims are not covered. Dkt. Nos. 13; 32. A review of the broad arbitration clauses in each contract confirms that they do encompass the claims at issue here. The 2018 Membership Agreement provides that "[a]ny controversy or claim arising out of or relating to your account(s) . . . shall be settled by binding arbitration." Dkt. 6-3 at 21. Here, all of Plaintiff's claims unquestionably arise out of and relate to the fees charged on her account with Defendant. Dkt. 1. Similarly, the 2020 Membership Agreement provides that "any controversy or claim arising out of or relating to these Agreements and Disclosures, or the breach thereof, and any other agreement, account, product, or service" raised by Plaintiff is subject to binding arbitration. Dkt. 18-4 at 2. Again, because all of Plaintiff's

claims relate to her agreements with Defendant, her accounts, and the products or services provided by Defendant, those claims are covered by the arbitration clause. Dkt. 1.

### v. *The Arbitration Clauses in the 2018 and 2020 Membership Agreements Are Not Unconscionable*

Perhaps recognizing that she is bound by the arbitration clauses contained in the 2018 and 2020 Membership Agreements, Plaintiff attempts to avoid their enforcement by arguing that they are unconscionable. Dkt. Nos. 13 at 19-21; 32 at 2. Plaintiff contends that the arbitration clauses are purportedly unconscionable in two ways: (i) because Plaintiff had no ability to opt-out of arbitration; and (ii) because the arbitration clause is unfairly one sided. Dkt. 13 at 19. The first argument applies to both arbitration clauses, but the second argument applies only to the 2020 Membership Agreement.[12]

When evaluating unconscionability, the Court applies Virginia law. In Virginia, unconscionability "has both a substantive and procedural element." *Lee v. Fairfax Cnty. Sch. Bd.*, 621 Fed. App'x 761, 763 (4th Cir. 2015) (*per curiam*). For a contract to be substantively unconscionable, "[t]he inequality must be so gross as to shock the conscious" and one that "no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other." *Smyth-Bros.-McCleary-McClellan Co. v. Beresford*, 128 Va. 137, 171 (Va. 1920); *see also Flint Hill Sch. v. McIntosh*, No. 181678, 2020 WL 33258, at *5 (Va. Jan. 2, 2020) (unpublished). Under Virginia law, procedural unconscionability "necessitates inequity and bad faith in 'the accompanying incidents . . . , such as concealments, misrepresentations, undue

---

[12] The 2018 Membership Agreement requires arbitration of all disputes – not just disputes raised by customers. Dkt. 6-3. The 2020 Membership Agreement, on the other hand, provides that Defendant "may, at Our option, pursue Our remedies by filing a legal action . . . or We may initiate arbitration proceedings," but permits customers to only "pursue Your remedies through binding arbitration." Dkt. 18-4.

advantage, oppressions on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like." *Lee*, 621 F. App'x at 763 (quoting *Chaplain v. Chaplain*, 54 Va. App. 762, 774 (Va. Ct. App. 2009)).

Courts in this District have rejected Plaintiff's opt-out argument. *See, e.g., Bennett v. Dillard's, Inc.*, 849 F. Supp. 2d 616, 620 (E.D. Va. 2011) (evaluating an arbitration agreement that lacked an opt-out provision but finding that "Dillard's employees had the option to work elsewhere, so the Arbitration Agreement is not . . . otherwise unconscionable"). Here, although not specifically a term in the contract, Plaintiff did retain the option to opt-out of arbitration – she could bank elsewhere. As Virginia courts recognize, that a contract is a contract of adhesion – like the contract here – does not make the contract "per se unconscionable." *Galloway v. Priority Imports Richmond, LLC*, 2019 WL 4307874, at *3 (E.D. Va. Sept. 11, 2019) (citing *Sanders v. Certified Car Ctr., Inc.*, 93 Va. Cir. 404, 406 (Va. Cir. Ct. 2016)).[13] Moreover, Plaintiff has cited no case finding that the lack of an opt-out clause renders an arbitration provision unconscionable.[14] Indeed, Plaintiff only argues that the lack of an opt-out clause "might" suggest unconscionability. Dkt. 13 at 19. Based on the authority discussed *supra*, this Court finds that the lack of an opt-out provision does not render the arbitration clause unconscionable. Thus, having addressed and

---

[13]*See also In re Checking Account Overdraft Litig.*, 856 F. App'x 238, 247 (11th Cir. 2021) (rejecting argument that an arbitration clause was procedurally unconscionable because it contained no opt-out clause); *Montgomery v. Applied Bank*, 848 F. Supp.2d 609, 616-17 (S.D. W. Va. 2012) (finding arbitration clause to be valid and enforceable even where it did not contain an opt-out clause).

[14] The two cases cited by Plaintiff only held that the presence of an opt-out provision meant that the arbitration clause was not unconscionable – those cases did not address the issue here: whether failure to include such a provision renders an arbitration clause unconscionable. *See Buckmire v. LaserShip, Inc.*, 2022 WL 4585523, at *8 (E.D. Va. Sept. 29, 2022) (finding no unconscionability where workers could opt out of arbitration); *Hawthorne v. Bj's Wholesale Club*, 2016 WL 4500867, at *6 (E.D. Va. Aug. 26, 2016) (same).

rejected the only argument targeting the 2018 Membership Agreement, the Court finds that the arbitration clause in the 2018 Membership Agreement is valid and enforceable.

Plaintiff's second argument regarding substantive unconscionability applies only to the 2020 Membership Agreement and its provision of unilateral arbitration obligations on consumers. Dkt. 13 at 20. Former U.S. District Judge Robert G. Doumar provided a compelling analysis of this issue under Virginia law in *United States ex rel. Harbor Constr. Co., Inc. v. T.H.R. Enter., Inc.*, 311 F. Supp. 3d 797 (E.D. Va. 2018). In that case, Judge Doumar determined that, under Virginia law, "a contract can be sufficiently mutual in its obligations, and thus have adequate consideration, even if some of the conditions of the contract are imposed on one party and not the other." *Id.* at 803 (citing *C.G. Blake Co. v. W.R. Smith & Son*, 147 Va. 960, 972 (1926)). Thus, Judge Doumar determined that, "as long as the contract as a whole is supported by adequate consideration, an arbitration provision need not impose a mutual obligation to arbitrate in order to be valid." *Id.*[15] This Court adopts Judge Doumar's reasoning and holds that the arbitration provision in the 2020 Membership Agreement is not unconscionable.

v. *The Motion to Dismiss Pursuant to the FAA*[16]

Because Plaintiff agreed to the arbitration clauses in the 2018 and 2020 Membership Agreements and because all of Plaintiff's claims are within the scope of those arbitration clauses,

---

[15] *See also Louis v. Geneva Enterprises, Inc.*, 128 F. Supp. 2d 912, 915 (E.D. Va. 2000) (enforcing arbitration agreement, even where provision did not require employer to arbitrate); *c.f. Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 91 n.5 (4th Cir. 2005) (rejecting argument that unilateral modification rendered arbitration agreement illusory, because the employer's discretion to amend the agreement "[was] limited to prospective disputes and by specific notice requirements").

[16] As noted *supra*, the motion is not appropriately styled as a motion to dismiss for lack of subject matter jurisdiction but is correctly based on the FAA. Defendant also made Rule 12(b)(6) arguments that the Court need not address here because the Complaint is subject to dismissal pursuant to the FAA under Fourth Circuit precedent.

the Motion to Dismiss will be granted insofar as it seeks dismissal of the complaint in favor of arbitration. *See Choice Hotels Int'l*, 252 F.3d at 709-10 ("Notwithstanding the terms of § 3 [of the FAA], however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable."). This Court will deny the Motion with respect to the 2021 Membership Agreement because the Court finds that, on this record, Plaintiff did not agree to the 2021 Membership Agreement. Additionally, because the Court finds that the claims raised in the Complaint are subject to arbitration, the Court need not reach the Rule 12(b)(6) arguments raised by the parties.

### IV. CONCLUSION

In sum, each of Plaintiff's claims is subject to arbitration under the 2020 Membership Agreement. Moreover, even if the 2020 Membership Agreement did not apply, each of Plaintiff's claims would be subject to arbitration under the 2018 Membership Agreement. Accordingly, for the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss and to Compel Arbitration (Dkt. 5) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that the Motion to Dismiss and to Compel Arbitration is GRANTED insofar as it seeks dismissal based on the arbitration clauses contained in the 2018 and 2020 Membership Agreements and that Motion is otherwise DENIED; and it is

FURTHER ORDERED that the Complaint (Dkt. 1) is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to administratively close this action and place it among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
February __, 2024

/s/
Rossie D. Alston, Jr.
United States District Judge

23